Filed 4/23/14  In re Perla R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re PERLA R., a Person Coming Under the Juvenile Court Law. | B251613 |
| | (Los Angeles County Super. Ct. No. CK66060) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| L. C., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Annabelle G. Cortez, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant L. C.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant Jesus R.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kimberly A. Roura, Deputy County Counsel for Plaintiff and Respondent.

Appellants L. C. (mother) and Jesus R. (father) appeal from the juvenile court's order terminating their parental rights over Perla R., born August 2010. Both parents contend the order must be reversed because the exception to terminating parental rights set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) applies to them.[1]

Substantial evidence supports the juvenile court's finding that no exception to terminating parental rights applied in this case. We therefore affirm the juvenile court's order.

### BACKGROUND

**Detention and section 300 petition**

On August 23, 2010, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging that one and a half month old Perla was at risk for general neglect because of mother's history of methamphetamine use and failure to reunify with her older children.

Mother had seven older children, three of whom had section 300 petitions sustained on their behalf based on mother's substance abuse history and methamphetamine use. Mother's son D. C. was removed from her at his birth in 2005 when mother tested positive for drugs. In 2006, mother again tested positive for drugs at the birth of her child Robert C., who was also removed from her care. Mother failed to reunify with Robert, who was adopted in 2008, and with D., over whom jurisdiction was terminated in 2009 pursuant to a family law order granting D.'s father sole legal and physical custody. In December 2009, the juvenile court sustained a section 300 on behalf of mother's child Angel A., who was placed with paternal relatives.[2]

In response to the August 2010 allegations, the Department's social worker met with mother, father, and Perla at the family's home. Neither mother nor Perla presented

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     While the instant case was ongoing, mother's parental rights over Angel were terminated.

2

signs of methamphetamine use or exhibited unusual behavior. The parents were well groomed and had appropriate supplies for the baby's care. Both parents submitted to "on demand" drug tests on August 24, August 30, and September 25, 2010, and produced negative test results.

The social worker also spoke with mother's substance abuse counselor at Homeboy Industries, where mother had enrolled on August 25, 2010. The counselor reported that mother had been compliant with the program. Based on its investigation, the Department filed, on behalf of Perla, a non-detention section 300 petition based on mother's five-year history of drug use and her previous failure to participate regularly in a court ordered substance abuse rehabilitation and drug testing program.

Both parents appeared at the October 5, 2010 detention hearing at which the juvenile court found father to be Perla's presumed father. The court ordered Perla detained from mother and released to father, but allowed mother to continue to reside in the family home with unmonitored contact with Perla so long as she continued to test negative for drugs and to participate in her substance abuse program.

**Jurisdiction/disposition**

In an interview with the Department's social worker on October 26, 2010, mother said she had used drugs and alcohol intermittently for the past five years, and that her drug of choice was methamphetamine. She claimed not to have used methamphetamine since November 2009 and that she was committed to remaining sober.

Mother tested negative for drugs eight times between August and November 2010. She missed testing on October 5 and 6 but tested negative on October 7.

Father said he had known mother for approximately 10 years. He began a relationship with mother after she left the father of her last child, Angel A. Father was aware of mother's substance abuse history, her failure to reunify with her children D. and Robert, and the detention of Angel from her care. He said mother had not used drugs during her pregnancy with Perla, and that he was willing to provide mother with the support she needed to remain sober.

At the January 12, 2011 adjudication hearing, mother submitted to an amended petition, and the juvenile court assumed jurisdiction over Perla under section 300, subdivision (b). The matter was continued for a contested dispositional hearing.

Mother tested positive for amphetamine and methamphetamine on February 4, 2011. She denied any drug use and insisted that the positive result was because she had taken a combination of prescription and over-the-counter medications, including medicine for blood pressure, over-the-counter cold remedies, and two pain medications she could not identify that were administered to her by her stepmother.

A technician from mother's drug testing company, Pacific Toxicology, told the social worker that the medications mother mentioned would not have caused a positive result for amphetamine and methamphetamine. The technician further stated that the levels detected in mother's sample were very high -- 538 ng/ml for amphetamine and 2575 ng/ml for methamphetamine.

On February 15, 2011, the juvenile court deemed the Department's report filed that day regarding mother's positive drug test to be a section 385 motion to change court orders. The court ordered mother to move out of the family home. The court further ordered that mother's visits take place outside of the home and that someone other than father serve as the monitor.

At the dispositional hearing held on February 22, 2011, the juvenile court ordered Perla removed from mother and placed with father. The court ordered mother to attend a drug rehabilitation program with random testing, parent education, and individual counseling. The court accorded mother monitored visits and gave the Department discretion to liberalize the visits after mother enrolled in a drug program and tested negative.

**Mother's section 388 petition**

Mother filed a section 388 petition on April 7, 2011, seeking to change the order that she not live in Perla's home. In support of her petition, mother stated that on March 3, 2011, she submitted to a hair follicle drug test and the results were negative for all substances. Mother further stated that the hair follicle test was more accurate and

covered a longer period of time than a urine test. She claimed that the February 4, 2011 urine test had been a "false positive." Mother also submitted letters from Homeboy Industries stating that she had begun individual counseling on January 7, 2011, and had completed four sessions, that she had attended 29 classes in a six-month substance abuse recovery program, and that she had completed a 10-week parenting program.

By May 2011, mother had completed Homeboy Industries' six-month outpatient drug program and was participating in aftercare. She had 10 negative drug tests since the February 4, 2011 positive test. Mother insisted that the testing center had mistakenly identified the February 4, 2011 positive test specimen as hers. Pacific Toxicology indicated that the February 4, 2011 specimen could be retested using D & L isomer analysis to differentiate legal drugs from illicit drugs. The Department recommended that the court order that this analysis be performed, along with a second hair follicle test, and that mother's section 388 petition be granted.

On May 17, 2011, the juvenile court granted mother's section 388 petition and allowed mother back into the home. The court ordered a hair follicle test and a D & L isomer analysis.

**Removal from mother and section 387 petition**

On June 30, 2011, Pacific Toxicology conducted a hair follicle test on mother, and the results were positive for methamphetamine. The testing staff opined that mother had likely used drugs sometime after the March 2011 hair follicle test.

Mother failed to appear for testing on July 12, 2011. On July 20, 2011, she tested positive for opiates and hydrocodone.

Pacific Toxicology performed a D & L isomer analysis on mother's February 4, 2011 urine sample. The results were positive for methamphetamine and showed a concentration of 96.4 percent illicit drugs and 3.6 percent legal over-the-counter drugs.

The Department scheduled a meeting on July 6, 2011, to discuss mother's test results. Both parents agreed to attend, but minutes before the meeting, mother called to reschedule for the following day. The next day, the social worker was unable to reach either parent.

5

On July 29, 2011, the juvenile court granted the Department's request for an order removing Perla from mother and releasing the child to father. On August 3, 2011, the Department filed a section 387 supplemental petition alleging Perla was at risk because of mother's continued drug abuse despite completion of her court ordered programs.

At an August 3, 2011 hearing, the juvenile court ordered Perla detained from mother and released to father. The court further ordered continued drug testing and an additional hair follicle test for mother. Mother was accorded monitored visits of two to three hours, two to three times per week.

Mother admitted taking her stepmother's pain medication but denied any methamphetamine use. She expressed her distrust of the testing site. She failed to appear for testing on July 27, 2011, but tested negative five times in August 2011.

Father stated he did not believe mother's positive drug tests were accurate and that he did not suspect mother of substance abuse. He admitted, however, that he did not have the experience to recognize when a person was under the influence. The Department expressed concern that father was monitoring mother's in home visits with Perla, and that he did not seem to be capable of terminating a visit if mother was under the influence.

Mother failed to appear for testing on August 29, 2011. She tested positive for amphetamines and methamphetamine on September 21, 2011. Mother denied any drug use but missed an appointment for a hair follicle test on October 4, 2011, and refused to submit to an on demand drug test on October 12, 2011.

Mother submitted to a hair follicle test on October 14, 2011, and the results were negative. A supervisor at Pacific Toxicology explained that a single instance of drug use would show up in a urine test, but not in a hair follicle test, which would produce a positive test result with more regular drug use. Pacific Toxicology's chief medical officer opined that in light of mother's several positive urine and hair follicle tests, including the positive urine test on September 21, 2011, and the negative hair follicle test on October 14, 2011, mother was likely engaging in occasional rather than continuous drug use.

At a November 2, 2011 hearing, the juvenile court sustained an amended section 387 petition. The court ordered mother to continue to participate in weekly drug tests, individual counseling, a drug treatment program with aftercare, and a 12-step program with a sponsor. The court further ordered father to participate in a narcotics anonymous program and individual counseling. Mother was accorded monitored visits in the Department's offices, two to three times per week.

**Removal from father and section 342 petition**

Mother produced negative drug tests throughout November and December 2011 but failed to appear for testing once in January and three times in February 2012. When a family acquaintance reported that father had a history of drug abuse that he had failed to disclose to the Department, the social worker became concerned, noting that father appeared pale and to have lost weight. At the social worker's request, father agreed to drug test on February 17, 2012, but failed to appear for testing on that date.

Mother's attendance at the twice weekly monitored visits was inconsistent. In October 2011, father cancelled three visits and mother cancelled two. Mother had three visits in November 2011, one visit in December 2011, two visits in January 2012, and none in February 2012.

The family's neighbors, who asked to remain anonymous, reported that mother had been visiting father's home on a regular basis, during the night and morning hours. During an unannounced visit in February, the social worker observed some of mother's personal effects in the home.

At a March 5, 2012 hearing, the juvenile court ordered father to drug test weekly and on demand. The court reiterated that mother's visits were to occur only at the Department's offices.

In March 2012, the Department learned that mother had been arrested in January for domestic violence after she threw a bottle at father. On March 27, 2012, the Department filed a section 342 petition alleging that the parents engaged in a violent altercation in Perla's presence, and that on January 7, 2012, mother was arrested after she threw a glass bottle at father, inflicting lacerations to his arm. The petition further

7

alleged that father abused alcohol and was under the influence during the January 7, 2012 altercation and that he had violated court orders by allowing mother into the home with unlimited access to Perla.

The police report of the domestic violence incident indicated that police responded to father's home at 1:30 a.m. on January 7, 2012. Father told the responding officers that he had come home intoxicated and that a verbal altercation with mother ensued. Mother picked up a glass bottle and threw it at him, striking his left elbow and causing two lacerations. Mother was arrested for cohabitant abuse.

Father told the social worker that he had been home with Perla when mother arrived and entered the home forcefully. He said the neighbors called the police. Father denied being intoxicated, but when confronted with his statement to the police that he had been intoxicated, father refused to discuss the matter further.

On March 18, 2012, the social worker spoke with one of the responding police officers. The officer said that Perla was present and awake when the police arrived. Mother, who appeared to be living in the home with father and Perla, admitted to being home alone with Perla when father arrived at the home intoxicated. An argument ensued, during which mother threw a bottle at father, causing injury to his elbow.

At a hearing on March 27, 2012, the juvenile court ordered Perla detained from father, and accorded him unmonitored visits. The court continued mother's monitored visits, but ordered that someone other than father serve as the monitor.

In April 2012, both parents denied the contents of the police report regarding the January 2012 domestic violence incident. They refused further interviews regarding the allegations of the section 342 petition.

Mother's substance abuse counselor at Homeboy Industries reported that mother's participation in her treatment program had been inconsistent, and if her participation did not improve, her case would be closed in May 2012. Homeboy Industries reported that father had enrolled in classes on April 9, 2012.

8

Mother had twice weekly visits with Perla. During an April 10, 2012 visit, the monitor reported that mother appeared to be under the influence because she behaved erratically and was incapable of having a linear conversation.

Father had twice weekly unmonitored visits and often accompanied mother to her monitored visits as well. On April 20, 2012, the juvenile court ordered father's visits increased to three times per week.

The service logs for the parents' visits during the period from November 9, 2011 to June 5, 2012, showed that the parents were affectionate and appropriate with Perla. They kissed, hugged, held, and carried Perla, fed her, changed her, sang to her, and comforted her. Perla appeared to enjoy the visits and was happy to see her parents.

Although the visits went well when they occurred, the parents did not visit consistently. They either cancelled or failed to attend monitored visits on April 11, April 25, May 8, May 29, and May 30. Mother missed two visits in April and three in May.

In May 2012, the director of father's domestic violence and individual counseling programs at Narconon reported that both father and mother were attending programs, but both parents' attendance had been inconsistent.

From March to May 2012, father had five negative drug tests and failed to appear for testing seven times. During the same period, mother had 12 negative tests and failed to appear for testing twice.

At a June 13, 2012 hearing, the juvenile court sustained the section 342 petition and ordered Perla removed from father's custody. Both parents were accorded family reunification services.

**Termination of reunification services**

On September 17, 2012, the Department filed a section 388 petition to change the court's order allowing unmonitored visits for father, based on father's failure to comply with court orders for drug testing. Father had not tested since May 3, 2012.

Father had also been inconsistent with his unmonitored visits. In June 2012, he attended 9 of 12 visits; 10 of 14 in July; 4 of 13 in August; and 4 of 9 in September. In

addition, father often arrived late for visits and would call to confirm a visit but then fail to appear, leaving Perla waiting for him.

On September 20, 2012, the juvenile court ordered that father's visits be monitored at the Department's office or another approved location. Father thereafter began attending monitored visits more consistently two times a week. On October 12, 2012, the juvenile court ordered that father's visits remain monitored until he submitted to four consecutive random drug tests. Thereafter, his visits could be unmonitored.

In November 2012, mother and father were evicted from their shared apartment for nonpayment of rent and utilities. Father went to live with a relative. Mother lived for a time with friends, but was also homeless for some time.

The managers of the apartment building the parents vacated, Noemi V. and her husband, were also Perla's godparents. They expressed an interest in caring for Perla, and mother and father were agreeable to placing Perla with them. Noemi told the social worker she knew both mother and father and that the parents had a hostile relationship while they were together. Noemi had observed the parents many times arguing in the hallway of their apartment building and had at times called the police to intervene.

Mother failed to appear for drug testing one day each month from June through September 2012. She failed to appear for testing three times in October 2012, two times in November 2012, and three times between December 2012 and January 2013. Although mother claimed to have enrolled in all of her court ordered programs, she could not provide verification of her enrollment.

Father failed to appear for any drug test. When asked why he had not tested, father stated that he was focused on working so that he could obtain housing for Perla. Father said he was enrolled in programs for parenting, domestic violence, and individual counseling, and provided a letter stating that he had enrolled in those programs on November 19, 2012.

From mid-October to mid-December 2012, father attended 13 monitored visits and missed three. He missed two scheduled visits from mid-December 2012 through March 5, 2013, but attended all of the other available twice-weekly visits. Mother attended five

10

of nine scheduled visits in July, one of nine in August, three of eight in September, six of 10 in October, and four of eight in November. From mid-December 2012 through March 5, 2013, mother missed four visits and arrived significantly late to eight visits.

Perla was placed with Noemi and her husband on December 14, 2012. During the weeks following Perla's placement, mother arrived unannounced at Noemi's home several times asking to see Perla but was denied the unscheduled visits.

At the March 13, 2013 review hearing, mother provided several letters verifying her participation in court ordered programs. A letter from Homeboy Industries stated that mother checked in with a case manager twice a month and attended outside NA/AA meetings. A letter from Jovenes, Inc. stated that mother had attended 16 of 25 domestic violence classes, and letter from Narconon Fresh Start stated that mother had enrolled in programs on May 1, 2012.

Father provided a letter from Jovenes, Inc. stating that he had attended 5 of 25 domestic violence classes and a letter from Community Family Counseling Programs stating that he had attended five individual therapy sessions, and one session each of parenting and domestic violence.

The juvenile court found that both parents' progress was minimal, terminated reunification services, and set the matter for a section 366.26 hearing. Both parents filed notices of intent to file writ petitions, which were summarily dismissed on June 5, 2013, for failure to comply with rule 8.452 of the California Rules of Court.

Father then filed a section 388 petition seeking reinstatement of reunification services and return of Perla to his care. In support of his petition, father stated he had documents showing his work as a father and that he could provide for all of Perla's needs, including a home. The juvenile court denied father's petition on April 8, 2013.

**Termination of parental rights**

In July 2013, the Department reported that Perla remained placed with Noemi and her husband and was thriving under their care. The caregivers' interaction with Perla was loving, nurturing, and appropriate. An adoption home study had been approved on June 13, 2013, and Noemi and her husband were committed to adopting Perla.

11

Noemi expressed concerns about Perla's emotional status, as the child was subject to mood swings and her behavior worsened after visits with mother and father. The Department provided a referral for therapeutic services.

In September 2013, the Department reported that Perla continued to thrive in her caregivers' home. She appeared happy, and communicated well with her caregivers, who said Perla was a joy in their lives. Noemi reported that Perla's behavior had improved with therapeutic services but deteriorated after visits with mother and father.

Visits for both parents were scheduled once a week, from 9:00 to 11:00 a.m. From March through August 2013, the parents had a total of 20 visits and missed five. In July and August, one or both parents arrived significantly late to four of the six visits they attended.

Both parents testified at the section 366.26 hearing. Mother testified that her visits with Perla had been limited to once a week throughout the case. She had asked for more frequent visits but was told there were not enough monitors available. When asked why her visits were still monitored, mother said she did not know. She admitted missing some drug tests, but claimed her hair follicle test proved she was "okay."

Mother said she was late to some visits because she was preparing food for Perla. She missed a visit near Perla's birthday because she had stayed up all night fixing a bicycle for Perla and then overslept the next day.

Mother described her visits with Perla, saying she played with her, carried her, and sang her lullabies. She told Perla that she loved and missed her. According to mother, Perla always asked to leave with the parents at the end of the visit. Mother responded by telling Perla to be patient and that hopefully she could do so soon.

Father testified that Perla calls him "poppy" and mother "mom." He admitted missing visits, stating that he relied on bus transportation that was time consuming. He acknowledged that he was given the opportunity to have unmonitored visits if he produced four consecutive negative drug tests, but that he failed to do so.

After hearing argument from counsel, the juvenile court found that the parental relationship exception to terminating parental rights did not apply. The court noted that

12

the parents' visits remained monitored, and that even with the limited number of visits available after reunification services were terminated, the parents still missed visits or arrived late. The juvenile court found that although there was a relationship between the parents and Perla, neither mother nor father had met their burden of showing that their relationship with Perla outweighed the child's need for permanence and stability. The court terminated mother's and father's parental rights and designated Noemi as Perla's prospective adoptive parent.

This appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

Section 366.26, subdivision (c)(1), provides for the termination of parental rights if family reunification services have been terminated and the juvenile court finds by clear and convincing evidence that the child is likely to be adopted. Once reunification services have been terminated, "'[f]amily preservation ceases to be of overriding concern . . . the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.]' [Citation.]" (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) "Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Although the statutory preference is in favor of adoption, section 366.26 lists certain exceptions that may preclude termination of parental rights, if the juvenile court finds "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

The juvenile court's ruling on whether an exception applies to terminating parental rights pursuant to section 366.26 is reviewed under the substantial evidence standard. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; *Autumn H., supra*, 27 Cal.App.4th at p. 576.) Under this standard, an appellate court must affirm the juvenile court's order if there is evidence that is reasonable, credible, and of solid value to support the order (*In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080), and the evidence must be considered "in the light most favorable to the prevailing party, giving the prevailing party the benefit

of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Autumn H.*, at p. 576.)

Mother and father contend the order terminating their parental rights should be reversed because the exception to terminating parental rights set forth in section 366.26, subdivision (c)(1)(B)(i) applies. That exception provides as follows: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The parent bears the burden of proving that this exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) "[T]he exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

For the exception to apply, the parent must have maintained regular visitation with the child, and the juvenile court must determine that the parent/child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) A parent must establish more than merely some benefit to the child by continuing the parent/child relationship. That relationship must be "a substantial, positive emotional attachment such that the child would be greatly harmed" if the relationship were severed. (*Ibid.*) To overcome the benefits associated with a stable, adoptive family, the parent seeking to continue a relationship with the child must prove that severing the relationship will cause not merely some harm, but *great harm* to the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.) Factors that the juvenile court should consider when determining the applicability of the exception include "[t]he age of the child, the portion of the child's life spent in the

14

parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Autumn H., supra*, at p. 576.)

## II. Substantial evidence supports the juvenile court's findings

Substantial evidence supports the juvenile court's determination that the parental exception to terminating parental rights did not apply. Perla was six months old when mother was ordered to leave the family home in February 2011. Although mother was allowed back into the home three months later she was again ordered out of the home in August 2011, when Perla was barely a year old. Her visits with Perla remained monitored thereafter.

Perla was 19 months old when she was removed from father's custody in 2012. Father had unmonitored visits with her for the next six months, until September 2012 when Perla was just over two years old. He was given the opportunity to resume unmonitored visits if he produced four consecutive negative drug tests, but his visits remained monitored throughout the balance of the case because he failed to do so.

During the period when father's visits were unmonitored, he often cancelled or failed to appear. He sometimes failed to appear even after calling to confirm a visit, leaving Perla waiting for him. Father continued to miss visits or to arrive late after his visits became monitored.

Mother missed a large number of her monitored visits throughout the case. She was offered twice weekly two-hour visits until her reunification services were terminated in March 2013, but she often cancelled, arrived late, or failed to appear altogether. This pattern of missing visits and arriving late continued after mother's reunification services were terminated and her visits were reduced to once a week. She failed to meet the requirement set forth in section 366.26, subdivision (c)(1)(B)(i) of maintaining regular visitation with Perla.

Father argues that he cared for Perla as a parent for nearly half of Perla's life, from her birth in August 2010 until she was detained from him in March 2012. Both parents argue that there was evidence that their visits with Perla were loving, that Perla recognized them as her parents, and that Perla shared a bond with them. They maintain

15

that they met their respective burdens of establishing that the benefit of continuing their relationships with Perla outweighs the benefits of adoption.

The existence of "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) In determining whether the parent/child relationship gives rise to an exception to terminating parental rights, the juvenile court must determine that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) To demonstrate that the parent/child relationship exception applies, "the parent must show more than that the relationship is 'beneficial.'" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, fn. 4.)

Substantial evidence supports the juvenile court's finding that the benefits of continuing mother's and father's relationship with Perla did not outweigh the benefits and permanence of adoption. When Perla was in the care of both parents, she was at risk of harm because of mother's substance abuse and father's apparent inability to recognize mother's drug use. There was evidence that the parents engaged in verbal altercations that sometimes required law enforcement intervention.

Before Perla was removed from father's custody, father violated court orders by allowing mother back into the home and giving her unlimited access to Perla. Perla was home alone with mother on January 7, 2012, when father returned home intoxicated and a violent altercation ensued. After the juvenile court ordered father's visits to be monitored, father was given the opportunity to regain unmonitored visits with Perla if he submitted to regular drug testing and produced four consecutive negative tests. He failed to do so. Mother never progressed beyond monitored visits, nor did she resolve her substance abuse problem. Both parents failed to maintain regular and consistent visits with Perla.

16

Perla was thriving in a safe, stable, loving, and nurturing home. Her caregivers were committed to adopting her. Substantial evidence supports the juvenile court's determination that mother and father failed to establish that the exception set forth in section 366.26, subdivision (c)(1)(B)(i) precluded the termination of their parental rights.

**DISPOSITION**

The order terminating parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST